## Case No. 15,060.

UNITED STATES v. The ETTA.

[4 Am. Law Reg. (N. S.) 38.]

District Court. D. New Jersey. Sept. Term, 1864.

PRIZE—FORFEITURE—PURCHASE FROM BELLIGERENT.

The sale of a vessel of war by a belligerent to a neutral during hostilities is not valid as against the other belligerent.

[Cited in The Georgia. Case No. 5,349; The Georgia v. U. S., 7 Wall. (74 U. S.) 42.]

In admiralty.

A. Q. Keasbey, U. S. Dist. Atty.

1. The proof shows beyond doubt that this vessel was the rebel privateer Retribution, and was liable to seizure and forfeiture for some, or all of the causes set forth in the libel; and having been so liable, these claimants must show that they have acquired such a title as purges the forfeiture, and gives them the absolute ownership, and the burden of proof is upon them. The Emulous [Case No. 4,479]; Ten Hogsheads of Rum [Id. 13,830];

The Short Staple [Id. 12,813]; The Eliza [Id. 4,346]. Unless they show a valid title their claim must be dismissed, and they have no concern with the disposition of the vessel, or the form of proceeding.

2. They simply allege that they bought in good faith, of a British subject at Nassau, who bought at an auction, under a condemnation by surveyors for unseaworthiness, made at the request of the rebel captain. If we admit this to be true, the question remains, does such a title shield her from forfeiture, and require a return of the vessel?

3. This title is invalid: First. Because she was originally captured by the rebels from the United States; and if they are to be treated as pirates, she was stolen, and no title could pass from them. Second. If they are to be treated as belligerents, and gained title by capture, they used her to aid the rebellion, and she became liable to forfeiture, and any transfer was void under the 6th section of act of July 17, 1862 (12 Stat. 590); and the forfeiture took effect on the commission of the offence, and avoids subsequent sale to an innocent purchaser. Unless the statute is in the alternative, and forfeits the article or its value, the forfeiture relates back to the commission of the offence. U. S. v. Grundy, 3 Cranch [7 U. S.] 337; U. S. v. 1960 Bags of Coffee, 8 Cranch [12 U. S.] 398; U. S. v. Mars, Id. 417; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 246; Caldwell v. U. S., 8 How. [49 U. S.] 366; which cases overrule the decision of Judge Story in The Mars [Case No. 9,106]. Third. If the transfer to a neutral purchaser in good faith, was not void by the statute, yet she was prize of war, and no sentence of condemnation is shown; and until such sentence, no valid title can be made by the captors. The Flad Oyen, 1 C. Rob. Adm. 135; Jecker v. Montgomery, 13 How. [54 U. S.] 516, and 18 How. [59 U. S.] 110; The Falcon, 6 C. Rob. Adm. 198; The Kierlighett, 3 C. Rob. Adm. 97; The Dawn [Case No. 3,665]; The Estrella, 4 Wheat. [17 U. S.] 298; The Jos. Segunda, 5 Wheat. [18 U. S.] 338; The Astrea, 1 Wheat. [14 U. S.] 125.

4. The sale of this vessel by an enemy to a neutral was illegal. Such sales of merchant ships, though sometimes held valid in England and this country, are always regarded with extreme suspicion. The Bernon, 1 C. Rob. Adm. 102; The Argo, Id. 158; The Sechs Geschwistern, 4 C. Rob. Adm. 101; Append. to 2 Wheat. [15 U. S.] 30. But the sale of an enemy's vessel of war to a neutral, has been held by Lord Stowell to be absolutely illegal. The Minerva, 6 C. Rob. Adm. 396. And this doctrine is approved by Judge Story in Append. to 2 Wheat. [15 U. S.] 31, and should now be judicially adopted in this, the first case that has arisen in this country.

5. Treating her as the absolute property of the rebels the title of the claimants is invalid (1) because even if they were innocent purchasers without notice, and the rebel captain was the duly authorized master, he had no

power to sell the ship. A sale under condemnation for unseaworthiness can be valid only in cases of extreme necessity, where the vessel cannot be repaired, and it must be optima fide. The Tilton [Case No. 14,054]. And there must be a judicial condemnation, and even then, courts will look behind it into all the facts. 1 Pars. Mar. Law, 66; 2 Pars. Mar. Law, 643, and cases cited; The Flad Oyen; The Dawn, ubi supra. Here was no extreme necessity, no condemnation, but a sham survey, a mere cloak for the desired sale. But the captain was not authorized to sell her under any circumstances. Such a condemnation and sale of a national war vessel would be illegal anywhere. And their title is invalid (2) because the testimony clearly shows that they were not bona fide or innocent purchasers, without notice. They had full notice of her character and history, and were bound to know that they could not acquire a valid title. They could acquire no title if there was even enough to put them on inquiry. The Ploughboy [Case No. 11,230]; The Tilton [supra].

6. To establish this claim would be to form a precedent dangerous to us, and invaluable to the rebels. They would find pliant surveyors in every neutral port, and a ready market for all their prizes, and for all their war vessels when disabled or hard pressed by our cruisers.

In reply to a suggestion by Mr. Edwards that the Sumter and the Georgia had been dismantled and sold, with the sanction of the British authorities, Mr. Keasbey replied, that no judicial confirmation of such sales had taken place, and that if those vessels should be overhauled by our cruisers, they would certainly be seized, and then the very questions in this case would remain to be decided in our courts.

Charles Edwards, for claimants, after objecting to the testimony of the informer, and to certain hearsay evidence, made the following points:

1. The Etta had become British property unconditionally, and the only question should be whether a bonâ fide buyer of a vessel in a neutral port, getting a title through British law, has to look further than liens. She had become British property before they purchased her, and they bought her of a British subject in a neutral port, and complied with all the requirements of British law, to make her a British vessel.

2. She had been condemned as unseaworthy by a competent board of surveyors, and ordered to be sold. The unseaworthiness of the vessel, coupled with the survey, sale, and register to Stead, the purchaser, granted by the custom house at Nassau, vested the property in him (Gordon v. Massachusetts Fire & Marine Ins. Co., 2 Pick 264); and the British title of the claimants is also perfectly clear. She was purchased bonâ fide and purely with a view to use her in peaceful neutral commerce. She does not appear to have had a warlike character at any time while she was at Nassau. Her seizure was that of a vessel of a country at peace with the United States. It was a tortious seizure, and restitution ought to be made. Talbot v. Jansen, 3 Dall. [3 U. S.] 133.

3. But even if she had borne the character of an enemy, honest change of ownership rubbed off enemy property. Enemy's ship may be bought by a neutral. The Sechs Geschwistern, 4 C. Rob. Adm. 100; The Johanna Emilie, Spinks, Prize Cas. 16, and same case in 29 Eng. Law & Eq. 562; 6 Op. Attys. Gen. p. 652; 7 Op. Attys. Gen. p. 538; The Ocean Bride, Spinks, Prize Cas. 79.

4. The charges against the vessel are of a criminal character, and must be proved by strict legal evidence, and the wrongful actors must be shown to be the owners; this must be done before the United States can have any standing, and yet even when it is done, we insist that she cannot be held.

5. Even if prior wrong committed is proved, yet she is not to be condemned unless she had a criminal character at the time of her seizure. U. S. v. 1960 Bags of Coffee, 8 Cranch [12 U. S.] 398; U. S. v. Mars, Id. 417; The Saunders [Case No. 12,372]; U. S. v. The Manginate, 3 Cranch [7 U. S.] 356; U. S. v. Grundy, Id. 337; Santissima Trinidad, 7 Wheat. [20 U. S.] 283. She had no such hostile character, or warlike vitality about her when first put up for sale at Nassau, but was even for peaceful purposes, unseaworthy.

6. There can be no confiscation under the act of August 6, 1861, [12 Stat. 319], unless upon legal proof of ownership, and illegal acts done by the owners. There is no such proof; and if condemnation is sought under the act of July 17, 1862, the test of property must be of the time of the seizure. There is nothing in the act which forfeits unconditionally from the date of the statute.

7. If the vessel was seized by the rebels and used in piratical aggressions, she is clearly not condemnable; her old ownership would continue. The principle applied to The Chesapeake Case would apply here. Pirates have no ownership. 1 Kent, 184; 2 Dods. 369; 1 W. Rob. Adm. 433; Hagg. Adm. 143.

8. It is not proved that she attempted to run the blockade, but, if she had, she cannot be tried for it on the instance side of this court, nor even in a prize court, for she had ended any such voyage. Man. Law Nat. 328; Wheat. Int. Law, pt. 4, c. 3, § 13; The Santissima Trinidad, 7 Wheat. [20 U. S.] 348.

FIELD, District Judge. This is an information filed by the district attorney, in behalf of the United States, and of Daniel Howell, against the schooner, now called the Etta, but lately known as the Retribution, seized at Jersey City, on the 1st day of September, 1863, for an alleged forfeiture under the laws of the United States. The libel, after reciting the existence of an insurrection

against the government of the United States, and the proclamation of the president of the 15th of April, 1861, proceeds to allege five distinct grounds of forfeiture. (1) That Vernon C. Locke and Thomas Jones, and other persons unknown, have acquired, purchased, sold, and given the said vessel, with intent that the same should be used and employed in aiding and abetting such insurrection, in violation of the 1st section of the act of August 6, 1861 [12 Stat. 319], entitled "An act to confiscate property used for insurrectionary purposes." (2) That in violation of the same section, the said Vernon C. Locke and Thomas Jones and others, being the owners of said vessel, have used and employed her in aid of such insurrection. (3) That the said vessel was the property of Vernon C. Locke and other persons unknown, acting as officers of the navy of the rebels, in arms against the government of the United States, and therefore liable to seizure under the 5th section of the act of July 17, 1862, entitled "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes." (4) That the said vessel was the property of Vernon C. Locke and others, holding certain offices and agencies under the government of the so-called "Confederate States of America," and therefore liable to seizure, under another clause of the same section of the act of July 17, 1862. (5) That the said vessel was purchased, fitted out in whole or in part, and held, for the purpose of being employed in the commission of piratical aggressions and depredations, and in the commission of other acts of piracy, as defined by the law of nations, in violation of the 1st section of the act of August 15, 1861, entitled "An act supplementary to an act entitled 'An act to protect the commerce of the United States, and punish the crime of piracy.'"

A claim is interposed by Gustave Renouard and Byron Bode, who allege that they are merchants, residents of Nassau, New Providence, British subjects, and bonâ fide owners of the said schooner Etta. That in the month of February, 1863, while the said schooner Etta, then called the Retribution, was in the port of Nassau, she was deemed unseaworthy, and a survey was duly had in Nassau upon her by competent shipbuilders and shipping merchants. That in consequence of such survey, and by order of the board of survey, she was in the said month of February, 1863, sold by public auction in Nassau to Thomas Stead of the same place, a British subject, who continued to hold and own her until about the 20th day of July thereafter, when he caused her to be sold by public auction at Nassau, at which sale these claimants bought her, in good faith and for a valuable consideration. That on the 2d day of July, 1863, and on the completion of such purchase, they received a bill of sale of her from the said Thomas Stead, took possession of her, and have been her sole owners ever since, no other persons

having any share, interest, or ownership in her. They also allege, that since they have owned the said vessel she has not been engaged in any illegal or piratical voyage, and that they have not been privy to or interested in any prior illegal or piratical voyage, and that they have never used her at any time in contravention of any statute of the United States, or been privy to or interested in any such contravention. It is to the question of the validity of this claim that the arguments of counsel have been chiefly directed.

Now the first, and by far the most important question in this case, according to the view which I take of it, is this, What was the character of this vessel? Was she a merchant vessel, or was she an armed vessel of war in the service of the Confederate States? As the judgment I am to pronounce will depend in a great measure upon the solution of this question, I propose to examine somewhat in detail the evidence bearing upon it. We have in the first place the testimony of Daniel Howell. The first time he ever saw the vessel was at Nassau, in March, 1863. She was at Cochran's Anchorage. He saw her through a glass, while lying there. She appeared like an ordinary schooner with a gun amidships. When she came into the harbor, he went on board of her. She was not then armed, but there were indications that she had been. There was a track on the deck for a swivel gun. It looked as if it had been used for that purpose. She was a fore and aft schooner, and had the appearance of having been altered from a propeller. The filling in at the stern, where the propeller had been, indicated it. He saw the captain on board. He went under the name of Captain Parker, but his real name was Vernon C. Locke. The captain told the witness that the vessel was the privateer Retribution; that she was originally the propeller "Uncle Ben," and had been taken from the Yankees. He said, he had knocked some half dozen vessels of the Yankees to pieces. He showed witness some chronometers which he said he had taken from the Yankees. He had six himself, and his first lieutenant, whose name was Gray, had four or five. But these declarations of Parker, it is said, are nothing but hearsay evidence, and therefore inadmissible. This may be so, and even if they were not, we should feel disposed to receive with many grains of allowance, the boastful account given of his exploits by this rebel captain. But what the witness saw himself is certainly evidence. There were the indications that the vessel had been originally a propeller; that she had been altered to a schooner; that she had been armed. There were the chronometers. They told their own tale, of American merchantmen plundered and destroyed. They were the customary trophies of rebel privateers. The witness saw the vessel every day until the latter part of April, when she went out, as he says, to run the blockade. She had then another captain on board named Jones. She went out

to go to Wilmington, as the captain said. She cleared at the custom house for St. Johns, "as all the runners of the blockade do." I quote the language of the witness. She was loaded with salt; the witness might have added, as all the blockade runners are. The witness was on board, and saw the salt. About ten days after she came into port again. She was in the same condition in which she had gone out, minus her salt. The witness went on board of her. She had lost her cargo. The captain told him, that just as he got out, a steamer sighted him, and in running away from her he shipped so much sea, that he lost all his cargo. Now here again, what the captain told him may be hearsay, but what he himself saw is competent evidence. She cleared for St. Johns. She had a cargo of salt on board. She came back in ten days without it. Such an explanation of these facts, as the captain is represented as giving, is certainly not improbable, and might, perhaps, be fairly inferred even without any direct evidence. This witness also states that when the vessel first came to Nassau, the captain told him he was going to get her condemned and have her sold; that it was a very easy matter to get a vessel condemned. Now it turns out in point of fact, that the vessel was condemned; and the process by which it was effected shows that the operation was not a difficult one.

But, it is contended by the counsel for the claimants, that Howell is an informer, and has, therefore, a direct interest in procuring a sentence of condemnation; and on that account is an incompetent witness. But I do not understand this to be the rule of law. On the contrary, it is laid down by Greenleaf, in his Treatise upon Evidence, that the fact of a witness for the prosecution being entitled to a reward from the government upon conviction of the offender, or to a portion of the fine or penalty inflicted, is not admitted as a valid objection to his competency. "The public," he observes, "has an interest in the suppression of crime and the conviction of criminals. It is with a view to stir up greater vigilance in apprehending, that rewards are given, and it would defeat the object of the legislature, to narrow the means of conviction by means of those rewards, and to exclude testimony which otherwise would have been admissible:" 1 Greenl. Ev. § 412. The interest which this witness has in the event of the suit, may detract somewhat from the credit to which his testimony is entitled, and may cause it to be received with a certain degree of jealousy. But I see no reason to doubt the substantial truth of his statements. In all important particulars, they are abundantly confirmed by the testimony of other witnesses.

Eppes Sargeant lives at Nassau, and is clerk of the Dry Dock in that city. Thinks the vessel came in the last of February or first of March, 1863. She same in at Cochran's Landing and lay there some time. He saw her when she came into the harbor. He saw a circle on her, where it appeared a gun had traversed. It was where they carry pivot guns. He knew of no other purpose for which such a mark could exist. She was advertised for sale by Adderly & Co., as the "Confederate Schooner Retribution." Witness saw the advertisement. Adderly & Co. were agents for most of the rebel steamers. The Retribution was universally known and spoken of as a rebel privateer. From a conversation he had with Mr. Bode, one of the claimants, witness supposed he knew all about her. Witness remarked to him, on learning she was coming to New York, that he bought her on purpose to make trouble between the two governments, knowing that she had been a privateer, and that she probably would be seized as soon as she arrived. His answer was, "If they seized her, he would make them pay well for her." He did not deny that he knew she had been a privateer.

Thomas Samson is a detective in the treasury department at New York. He was in the Bahama Islands in the spring of 1863; was sent by board of underwriters and marshal to look after blockade runners. He first saw the schooner Retribution on the south side of Long Key. She was a rebel privateer, and armed. Remembers distinctly seeing one, and he thinks two, guns on board of her. Saw two of the officers of the vessel, the first and second lieutenants. Had a conversation about the difficulty between the North and the South. The captain of the Retribution said, "they had done nothing more than the North had." This was about the 15th of February, 1863. The witness next saw the Retribution, about a month afterwards, at Cochran's Anchorage, about five miles from the city of Nassau. She had no guns then. The Retribution was publicly and generally known at Nassau as a rebel privateer. It was as notorious as anything could be. Nobody doubted it. Such is an outline of the evidence adduced on the part of the libellants touching the character of this vessel. Is it contradicted by the witnesses who have been examined on the part of the claimants? So far from this, it is confirmed in almost every particular. Byron Bode, one of the claimants, on his cross-examination says: "The Etta was known as the 'Retribution,' when she arrived at Nassau. I heard that she had been a propeller, and altered to her present state and shape as a schooner."

Charles I. Marshall says: "I heard that the Etta had been a privateer. I believe it was publicly known at Nassau."

George D. Harris says: "I believe the vessel to have been once employed in the service of the Confederate States as a privateer, under the name of the 'Retribution.' I think it probable it was known at Nassau, although I really don't know that it was. I knew Captain Parker in command of her when she was the Retribution. She was called the 'Retribution' when she arrived." In the copy of the

register granted to Thomas Stead, she is described as foreign built—her name "Etta"—and her foreign name "Retribution."

William Sawyer, who was the harbor master at Nassau, and one of the surveyors upon whose report she was condemned, says: "The vessel was called the 'Retribution' when I saw her first. It was said then that she was a Confederate vessel of war."

The testimony of Edward B. A. Taylor too upon this point is very significant, and must, I think, remove all doubt as to the true character of this vessel. He was the acting receiver general, and registrar of shipping at Nassau, and was examined as a witness upon the part of the claimants. "The Retribution," he says, "did not enter as a trader in this port of Nassau. She was treated as a Confederate vessel of war. Such vessels do not pass the receiver general's office at all."

From all the evidence then in this case, it is impossible to resist the conviction, that this vessel was an armed vessel of war in the service of the Confederate States. She was probably as well known at Nassau, as the Sumter at Gibraltar, or the Georgia at Liverpool. Could then the claimants, who are British subjects residing at Nassau, acquire a valid title to her, by a bill of sale, or in any other way? It is really the case of a purchase by a neutral, of a vessel of war belonging to a belligerent, while lying imprisoned in a neutral port, from which there was no escape without peril of capture. I use the terms "neutral," and "belligerent," as descriptive of the relation which subsists between the claimants and the Confederate States, because, by her proclamation of neutrality, of the 13th of May, 1861, the queen of England recognised "hostilities as existing between the government of the United States of America, and certain states styling themselves 'The Confederate States of America' "; and the supreme court of the United States have decided, that after such an official recognition by the sovereign, a citizen of a foreign state is estopped from denying the existence of a war with all its consequences as regards neutrals. Prize Cases, 2 Black [67 U. S.] 669.

This question, as to the right of a neutral to purchase an enemy's vessel of war, would at any time, and under any circumstances, be a question of importance; but it derives an especial interest from the nature and character of the war in which we are now engaged, and which would render the exercise of such a right, supposing it to exist, peculiarly liable to abuse. It is a matter of some surprise, that a question confessedly so important, and one too so likely to arise, should not have received a larger share of attention from writers on international law, and that it should not have been the subject of more frequent judicial determination. And yet, with the exception of the case of The Minerva [6 C. Rob. Adm. 396], decided by Lord Stowell in 1807, and which has been silently adopted as an authority by subsequent text writers, it has never, so far as I have been able to ascertain, been the subject either of legal discussion or of legal adjudication.

With regard to the purchase of merchant vessels belonging to a belligerent the case is otherwise. The question has frequently arisen, and there are repeated decisions in reference to it in the English courts of admiralty. The law, however, upon this subject varies in different countries. The 7th article of the French regulations of the 26th of July, 1778, which is still in force, provides, that enemy-built vessels cannot be reputed to belong to neutrals, unless there is documentary proof found on board, that the sale to a subject of an ally or neutral was made before the commencement of hostilities. This regulation is thus defended in a recent French treatise, in answer to the question, of what importance it is, whether enemy's vessels have been sold to neutrals before or after hostilities. "Belligerents, in desiring in maritime wars to appropriate to themselves ships of their enemies, do not wish that the latter should, to avoid capture and confiscation, realize the capital which their vessels represent. All enemy's vessels pursued by cruisers, and in danger of being captured, would take refuge in neutral ports, and in order that they might not be captured, their owners would sell them to neutral citizens." See Lawr. Wheat. Int. Law, 581, note. The Russian rule would seem to be the same as the French. In England, however, the validity of such purchases has been sustained, not however without much discussion, and some hesitation of opinion. They are allowed to be legal, but obnoxious to much suspicion, and courts will always feel it to be their duty to look into them with great jealousy. The Bernon, 1 C. Rob. Adm. 102; The Sechs Geschwistern, 4 C. Rob. Adm. 101. Such too would appear to be the law in the United States. 2 Wheat. [15 U. S.] Append. 450; 6 Op. Attys. Gen. p. 652; 7 Op. Attys. Gen. p. 538. Of course, in countries like France and Russia, where the transfer of an enemy's merchant ships is held to be illegal, the purchase of ships of war belonging to an enemy must be deemed illegal also. For every possible reason which could be assigned for the one, would apply with tenfold force to the other. But how is it in England and the United States, where the purchase by a neutral of an enemy's merchant vessel is not in general illegal? Is the right of purchase confined to merchant vessels, or does it extend also to vessels of war? There is, as I said before, but a single adjudged case, in which the question seems to have arisen. It is the case of The Minerva, decided by Lord Stowell, and reported in 6 C. Rob. Adm. 396. It was the case of a vessel under Kniphausen colors, and claimed by Count Bentinck, Lord of Kniphausen, as a ship purchased by him, in April, 1807, in the port of Bergen. She had

been a Dutch ship of war, belonging to the Dutch East India Company, and had been chased into North Bergen after an action with a British frigate, and had been lying in that port for nearly three years. Count Bentinck was allowed to appear in person before the court, and explain the circumstances of the transaction. He stated that the vessel had been long ago disposed of, at the breaking up of the Dutch East India Company, to individuals, on whose account she had since continued in the port of Bergen; and that it was from these persons, and not from the government of Holland, or from any public company, that the purchase was made. It was also stated that the vessel was purchased for the purpose of being employed in the West India trade to St. Thomas; and that she was on her way from Bergen to Kniphausen when she was captured. Here then was the case of a vessel, not belonging to the government of Holland but to the Dutch East India Company; a vessel that had been lying for nearly three years in a neutral port; that had been sold, a long time before, upon the breaking up of the company, to individuals, from whom she was purchased by a sovereign prince for the purpose of being employed in a legitimate trade. If, under these circumstances, the purchase was illegal, it would be difficult to imagine any possible case, in which the transfer of an enemy's war vessel to a neutral could be deemed lawful. And yet Lord Stowell rejected the claim, and held the transaction not to be legal. "The first question," he says in delivering his judgment, "is whether such a purchase can be legally made? I am not aware of any case in this court, or in the court of appeal, in which the legality of such a purchase has been recognised. There have been cases of merchant vessels driven into ports out of which they could not escape, and there sold, in which after much discussion and some hesitation of opinion, the validity of the purchase has been sustained. Such cases, I believe, did occur during the first war, in which I attended this court or the court of appeal. But whether the purchase of a vessel of this description built for war, and employed as such, and now rendered incapable of acting as a ship of war, by the arms of the other belligerents, and driven into a neutral port for shelter, whether the purchase of such a ship, I say, can be allowed, which shall enable the enemy so far to rescue himself from the disadvantages into which he has fallen, as to have the value at least restored to him by a neutral purchaser, is a question on which I shall wait for the authority of the superior court before I admit the validity of such transfer. That a private merchant could lawfully do this, I shall not hold, till I am so instructed by the superior court. That a sovereign prince should embark in such a transaction, unless under such guards as would effectually remove all possibility of abuse, is what, but for the instance before us, could

scarcely have been expected. Some communication, at least we might suppose, would be made to the belligerent government, accompanied with a disclosure of every circumstance of caution that should exclude the suspicion of what is always to be apprehended, the danger of such a vessel finding her way back again into the navy of her own country."

The judgment in this case was not appealed from; its correctness, so far as I know, has never been called in question; and the principle involved in it has since been adopted by English text-writers as a settled rule of international law 2 Wildm. Int. Law, 90; Hasack, Rights of Neutrals, 81; Hazlitt & R. Manual Int. Law, 209.

In this country the question seems never to have received a judicial determination; but in the appendix to the second volume of Wheaton's Reports, which is now known to have been written by Judge Story, after stating that the purchase by neutrals of enemies' ships during war is not in general illegal, the author adds: "But the right of purchase by neutrals, extends only to merchant ships of enemies; for the purchase of ships of war belonging to enemies is held to be invalid." And the case of The Minerva is referred to as an authority for this position. We have then the highest legal authority, both in England and this country, for the doctrine, that the purchase by a neutral of an enemy's ship of war is illegal. When Lord Stowell and Judge Story agree, upon a question touching belligerent rights and neutral responsibilities, he must be a bold man that would venture to differ. But the doctrine is sustained by reason as well as by authority. And perhaps no case could furnish a better illustration of the wisdom and propriety of the rule, than the one now under consideration. Here is an armed vessel, in the service of the Confederate States, which after preying upon our commerce with a boldness and success which almost commands admiration, takes refuge from the vigilance of our cruisers in the neutral port of Nassau. Deterred from venturing out for fear of capture, she is stripped of her armament, purchased by a citizen of Nassau, obtains a British register under a new name, clears for a neutral port, and then endeavors to run the blockade, and make her way back to a hostile port, where she may be repaired and refitted as a vessel of war, and again sally forth upon a new career of plunder and depredation. A vessel under such circumstances cannot be a legitimate subject of commercial speculation. A neutral who purchases her, whatever may be his motives, does it at his peril. He may design to devote her to peaceful commerce, but the warlike character once impressed still adheres to her. He may call her the "Etta," but she is still the "Retribution," and by that name will be known and remembered.

The counsel for the claimants, in the course of his very able argument, alluded to the

cases of the "Sumter," and the "Georgia," both of which had been Confederate vessels of war, and both of which had been transferred to neutrals. The inference that he would draw from these instances is, that such transfers could not have been illegal. But this is assuming the very point in controversy. When the legality of those transfers shall have been affirmed by our judicial tribunals, then, and not till then, can an argument in favor of the claimants be derived from them. On the contrary, these transactions only show the frequency and the facility with which such transfers are made, and ought therefore to admonish us of the danger of sanctioning such a practice. Let it be understood that such transactions are lawful, and we may look to see every rebel privateer, chased by our cruisers into a neutral port, emerging in a few days clothed with a British register—decked in new colors—and called by a new name.

But it is insisted that this vessel, after her arrival at Nassau, was, upon a survey, found to be unseaworthy, and thereupon sold at public auction, and that Stead, the purchaser, thereby acquired a valid title, which he afterwards transferred to the claimants. That there are circumstances under which the master of a merchant vessel may, in the absence of the owner, and upon a report by surveyors of her unseaworthiness, sell her, so as to vest the property in the purchaser, is undoubtedly true. But this is only in a case of supreme necessity, which sweeps all ordinary rules before it. It must be a necessity which leaves no alternative, which prescribes the law for itself, and puts the party in a positive state of compulsion to act. The master in such a case acts for the owner, because he has no opportunity to act for himself. If the property could be kept safely until he could be consulted, and have an opportunity in a reasonable time to exercise his own judgment as to the propriety of a sale, the necessity to act for him would cease. It is not enough that the master acts in good faith and for the interest of all concerned, if the requisite necessity for the sale be not clearly made out. Not even the sanction of a vice-admiralty court, much less the report of surveyors, will aid the sale when the requisite necessity is wanting. The master is employed only to navigate the ship, and the sale of it is manifestly beyond his commission, and becomes the unauthorized act of a servant, disposing of property which he was intrusted only to carry and convey. This is the doctrine of all the cases upon the subject, both in England and in this country, and is sanctioned by the very highest authority: Idle v. Royal Exchange Assur. Co., 8 Taunt. 755; Read v. Bonham, 3 Brod. & B. 147; Robertson v. Clarke, 1 Bing. 445; Hall v. Franklin Ins. Co., 9 Pick. 466; The Tilton [Case No. 14,054]; 3 Kent, Comm. (2d Ed.) 173.

Now it would not be difficult to show, from an examination of the evidence in this case, that no such necessity existed as would have justified the sale of this vessel, supposing it to have been an ordinary merchant ship. But no such examination is necessary, for the vessel in question was, as we have already seen, not a merchant vessel at all, but an armed vessel of war in the service of the Confederate States. That the officer in command of a war vessel of a belligerent can, under the pretence of her being unseaworthy, have her condemned and sold in a neutral port; and that a valid title can thus be acquired to her, is a proposition too monstrous to merit a moment's discussion. The relation in which such an officer stands towards those by whom he is commissioned and employed, is so entirely different from that which subsists between the master of a merchant vessel and the owner, that no rule drawn from the one can, under any possible circumstances, be applicable to the other. And even admitting that, as between the captain of this vessel and her owners, the sale of her under the circumstances was justifiable, still it was a transfer to a neutral of a war vessel of a belligerent, and, therefore, as I have endeavored to show, illegal. Surely, if the owners of this vessel could convey to Stead no valid title to her, it will hardly be pretended that the captain, acting as he always does in such cases as agent for the owners, could do so. If then the sale of this vessel to Stead conveyed no title to him, he of course could transmit no title to the claimants.

Whether the claimants, Renouard and Bode, acted in good faith in the purchase of this vessel, it is unnecessary to inquire. That they are respectable merchants of Nassau, that they paid a valuable consideration for her, and that they had no intention of employing her for any illegal purposes, are cheerfully admitted. This is more, however, than can be said with regard to Stead. There is too much reason to believe that his object in purchasing the vessel was to employ her in running the blockade. But whether this be so or not, it is a matter of no importance, in the view which I have taken of this case. He had no right to purchase her for any purpose. And as to Renouard and Bode, they must have known that this had been a war vessel in the service of the Confederate States, and they ought to have known that for this reason, she was not a legitimate object of commercial speculation.

The claim is rejected.